## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DENNIS TOWNSEND,

    *Plaintiff/Counter-Defendant*,

v.

ADVANCED ENERGY MACHINES, LLC,

    *Defendant/Counter-Plaintiff,*

v.

NIVALIS ENERGY SYSTEMS, LLC.

    *Counter-Defendant.*

Case No. 24-cv-2520-ABA
**FILED UNDER SEAL[1]**

### MEMORANDUM OPINION

Plaintiff Dennis Townsend ("Townsend") filed this case in the Circuit Court for Baltimore County against Defendant Advanced Energy Machines, LLC ("AEM") for breach of contract, alleging that AEM breached the terms of a promissory note. AEM removed the case to this Court and responded with a number of counterclaims against Townsend and claims against Nivalis Energy Systems, LLC ("Nivalis"), one of Townsend's companies. Townsend and Nivalis have moved to dismiss AEM's counterclaims. ECF No. 22. For the reasons stated below, the motion to dismiss will be granted in part and denied in part.

### I.     BACKGROUND

At the pleadings stage, the Court "must accept as true all of the factual allegations

---

[1] The counterclaim filed by Advanced Energy Machines, LLC (ECF No. 13) was filed under seal, but the briefs for the motion to dismiss the counterclaim (ECF Nos. 22, 25, 27) were not. Therefore, it is unclear to the Court whether any portions of this memorandum opinion should be sealed. As set forth in the accompanying order, the parties shall meet and confer and report back to the Court regarding any portions of this opinion should be sealed.

contained in the [counterclaim] and draw all reasonable inferences in favor of the [non-movant]." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). AEM alleges as follows in its counterclaim. ECF No. 13 at 13–58.[2]

 Townsend is a Maryland individual who operates through multiple entities, including Townsend Capital, LLC and Nivalis. CC ¶¶ 13, 17; ECF No. 4 ¶ 2. Nivalis is Townsend's battery and truck refrigeration business, and it is a Delaware limited liability company headquartered in Maryland. CC ¶¶ 14, 17.

AEM is a Nevada limited liability company that has developed transport refrigeration units ("TRUs") that use "solar and battery power and leave[] zero emissions" (the "SolarTechTRU"). CC ¶ 2, 3, 12. Robert Koelsch ("Robert") is the President of AEM, and Ronald Koelsch ("Ronald") is its Chief Technical Officer. CC ¶ 1. The SolarTechTRU technology has been patented and also contains additional patented technology. CC ¶ 23. AEM developed this technology in response to the "highly pollutive" nature of the current industry-standard diesel TRUs. CC ¶¶ 26, 27. As a result of AEM's development of the SolarTechTRU, "California has made various development grants available to AEM worth millions of dollars." CC ¶ 28. AEM is currently "the only successful business" in the marketplace for products like SolarTechTRU and is "its biggest and earliest innovator in the field." CC ¶ 29.

Powering SolarTechTRU requires "high quality, high-capacity lithium batteries" that preferably "will last for years with reasonable charging." CC ¶ 30. From 2009 to

---

[2] The counterclaim allegations begin at page 13 of ECF No. 13. Those allegations are numbered separately from AEM's responses to Townsend's allegations and AEM's affirmative defenses. The pending motion to dismiss addresses only AEM's counterclaim, and so the allegations relevant to this opinion are all those in AEM's counterclaims. The Court will cite those allegations as "CC ¶ ___."

September 2022, AEM had multiple suppliers for these batteries. CC ¶ 31. One of these suppliers, beginning around 2012, was a company called AllCell. *Id.* "Townsend worked for AllCell and was the person at AllCell who worked closest with Ronald and Robert at AEM on the AEM account." *Id.* AllCell's batteries "came through LG Electronics," and while these batteries were "good," they "did not entirely fulfill AEM's needs, and generally had a life of only four to five years." CC ¶ 32. As a result, Ronald and Robert developed a sophisticated battery management system ("BMS") for the AllCell battery that was also compatible with the SolarTechTRU. CC ¶ 34. "The SolarTechTRU was prototyped during the 2017-2021 period using the AllCell batteries and batteries from one other source, and the BMS that Robert and Ronald developed." CC ¶ 35. AEM began earning revenue in 2020. *Id.*

During the period when AEM worked with AllCell, "Townsend bought the AllCell business and also began operating Nivalis." CC ¶ 36. During his work at AllCell, Townsend would often remark, including in "multiple meetings with Robert and Ronald," about how SolarTechTRU and zero-emission TRUs "could be highly lucrative." CC ¶ 38. On August 20, 2020, Townsend wrote to Robert asking him, "[C]ould you please send me the numbers that you have compiled on the economics of your battery units vs. conventional diesel powered ones?" CC ¶ 40. On December 1, 2020, during a Teams meeting, "Townsend told Robert and Ronald that he was going to start a new battery business through [Nivalis] which would use a new, more efficient, high-capacity battery, sourced from LG Electronics in Korea, which would have double the battery life of the former AllCell batteries." CC ¶ 41. AEM alleges that Townsend made this statement "despite the fact that he had not done the testing necessary to establish the truthfulness of this assortment." CC ¶ 42.

For a period of time after this call, Townsend continued to express excitement over the SolarTechTRU. CC ¶ 43. On September 8, 2021, Townsend wrote to Ronald and Robert that "[c]limate change and the health impact from pollution are finally getting the attention and respect that they deserve[]" and that "there are now economically viable and[,] in many cases, economically compelling alternatives [that] will start to accelerate the businesses that offer these solutions." *Id.* He added that "Reefers, in particular the AEM versions, are at the top of that list." *Id.* Sometime in 2021, Townsend sold AllCell. CC ¶ 37.

On December 2, 2021, Townsend had a Teams meeting with Robert, during which Townsend's attorney was present. CC ¶ 44. During the meeting, Townsend offered to invest in AEM and sell Nivalis's battery packs to AEM, again representing that these battery packs "would be a newer, more efficient, high-capacity battery that would have double the battery life of the former AllCell batteries." CC ¶ 45. During this meeting, "Townsend and Robert also discussed giving Townsend access to AEM's proprietary, confidential and trade secret information as part of his due diligence for this investment into AEM." CC ¶ 47. AEM agreed to allow Townsend to have access to "customer information, sensitive financial information, vendor information, information on costs, and profit margin information." CC ¶ 48. Townsend's access to this information "was limited to his due diligence"; under the terms of his access, he "was not permitted to use that information for his own or for other purposes." CC ¶ 50.

AEM alleges that Robert and Townsend, "on a handshake, agreed that Townsend would invest approximately $2 million" into AEM for an unspecified share of equity that would be finalized after Townsend's due diligence. CC ¶ 49. Townsend made the following capital contributions into AEM: $600,000 on February 2, 2022; $500,000 on

March 3, 2022; $250,000 on April 22, 2022; $200,000 on May 13, 2022; $200,000 on May 17, 2022; and $150,000 on August 23, 2022. CC ¶ 51.

On February 9, 2022, Townsend had another Teams meeting with Ronald and Robert during which he reiterated "the supposed superiority of Nivalis' LG batteries, including their high-capacity and their longevity, insisting that Nivalis' new Battery Packs would last for 8-12 years." CC ¶ 52. He went on to propose "that the parties enter into an exclusive sales agreement" under which Nivalis would be the exclusive supplier of battery packs to AEM. *Id*. During this time, Townsend and Nivalis were working with a Canadian company, Linamar Corporation ("Linamar"). CC ¶¶ 53-54. Townsend raised the idea of Linamar also investing in AEM and gaining access to AEM's proprietary and trade secret information for due diligence. *Id*. "Linamar was also involved with a subcontractor named eMatrix, which Townsend and Nivalis intended to use for the production of a BMS for the Nivalis batteries." *Id*.

On February 14, 2022, one of Linamar's employees, Ryan Kemmet, went to AEM's Arizona headquarters to meet with Ronald, tour AEM's facilities, and learn about SolarTechTRU. CC ¶ 55. During this visit, "Kemmet learned proprietary, confidential and trade secret information . . . on behalf of Townsend and Nivalis." *Id*. Over the next several months, Townsend, Kemmet, and other Nivalis employees communicated with Robert and Ronald to learn more about AEM. CC ¶ 56.

On June 15, 2022, AEM, Nivalis, and Linamar entered into a non-disclosure agreement (the "NDA"), formalizing the parties' understanding as to the confidential, proprietary and trade secret information being shared by AEM during the due diligence process. CC ¶ 57. The NDA defines "Confidential Information" as follows:

> ... any and all technical and non-technical information

disclosed by each Party (the "***Disclosing Party***") to any other Party (the "***Receiving Party***") which may include, without limitation: (a) patent and patent applications; (b) trade secrets; (c) proprietary and confidential information, ideas, techniques, sketches, drawings, works of authorship, models, inventions, know-how, processes, apparatuses, equipment, algorithms, software programs, software source documents, and formulae related to the current, future, and proposed products and services of each of the Parties, such as information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing, manufacturing, customer lists, investors, employees, business and contractual relationships, business forecasts, sales and merchandising, and marketing plans; and (d) all other information that the Receiving Party knew, or reasonably should have known, was the Confidential Information of the Disclosing Party.

CC ¶ 58 (emphasis in original).

All parties agreed that "at all times and notwithstanding any termination or expiration of this Agreement" they would "hold in strict confidence and not disclose to any third party, non-signatory to this Agreement any Confidential Information of the Disclosing Party, and will use the Confidential Information of the Disclosing Party for no purpose other than the Permitted Use." *Id*. "Permitted Use" was in turn defined as "for use in evaluating or pursuing a business relationship between the parties." *Id*. They agreed to "protect such Confidential Information with at least the same degree of care that each Receiving Party uses to protect its own Confidential Information, but in no cause, less than reasonable care," and to "limit access to the Confidential Information of the Disclosing Party to only those of its Affiliates, employees or authorized representatives having a need to know and who have signed confidentiality agreements, or are otherwise bound by . . . confidentiality obligations at least as restrictive as those

contained herein." *Id.* The NDA also made clear that although AEM was giving limited access to its Confidential Information, that information "remain[ed] the sole property of the Disclosing Party." *Id.*

Townsend signed the NDA on behalf of Nivalis; Robert signed on behalf of AEM. CC ¶ 59. After the NDA was signed, AEM shared "[a]dditional confidential, proprietary and trade secret information . . . with Linamar and Nivalis/Townsend." CC ¶ 61.

In the summer of 2022, Linamar, Nivalis, and Townsend declined to invest in AEM. CC ¶¶ 62–63. Townsend "instead wanted to wrap [AEM] into a note that would also partially fund the purchase of Battery Packs." CC ¶ 63. Townsend sent a draft letter agreement "concerning the loan and sale of Battery Packs to Robert and Ronald at AEM." CC ¶ 64. The letter agreement was prepared by Townsend's credit company Townsend Capital. *Id.* On August 22, 2022, Robert executed the letter agreement (the "Letter Agreement") on AEM's behalf. *Id.* The Letter Agreement "explicitly tied the sale of Battery Packs to the proposed loan, making clear that they were parts of the same transaction," specifically by noting that "$1,750,000 had been advanced previously, and that an additional $150,000 would be advanced for a total of $1.9 million." CC ¶ 65. It went on to provide "that the amounts advanced will be evidenced by a Promissory Note . . . with a maturity date of 1 year and an interest rate of 8.0% per annum." *Id.*

The Letter Agreement also explained that AEM was "in the process of negotiating a contract with Nivalis . . . for the supply of 1,000 Units at an approximat[e] cost of $375.00 per KWH," which the parties "anticipated to be executed on or before August 26, 2022." CC ¶ 67. The Letter Agreement required Townsend, in the event "AEM and Nivalis enter into the Supply Agreement," to "lend AEM an additional $350,000" (which would increase the initial principal amount of the Note from $1.9 million to $2.25

million). *Id.* The parties also agreed that "for each Pack sold by AEM, AEM shall submit to Townsend a principal paydown in the amount of $6,410.00 per pack." CC ¶ 67 (emphasis in original). AEM agreed to these terms based on Townsend's representations about the superior quality of Nivalis's battery packs. CC ¶ 66.

On September 14, 2022, AEM and Nivalis entered into three agreements contemplated by the Letter Agreement. CC ¶ 68. The first was the Promissory Note, which ended up being for $5.1 million, including approximately $3 million beyond the amount contemplated in the Letter Agreement. *Id.* The second was a Pledge and Security Agreement ("Security Agreement"), which "allow[ed] Townsend upon default and a judgment under the Note to collect against all of AEM's assets, including its lucrative assets related to the SolarTechTRU." *Id.* Last, the parties entered into an exclusive supply agreement (the "Supply Agreement") that made Nivalis the exclusive battery supplier for AEM, required that the parties keep sensitive information confidential, and included specifications for the performance of the battery packs. *Id.*

AEM alleges that all of Nivalis's battery packs were defective and had performance problems, and in some cases almost caused fires in the AEM factory. CC ¶¶ 70-76. As early as April 11, 2023, "Kemmet emailed Robert, Ronald and Townsend that the capacity for the batteries was lower than in the Supply Agreement specification sheet." CC ¶ 76. On May 18, 2023, a meeting was held between Ronald, Townsend, Kemmet, and several other individuals on behalf of AEM and Nivalis. CC ¶ 77.

Although Robert and Ronald felt that they could address the battery issues by modifying the existing battery packs, AEM felt that "the failure of the batteries to perform as promised made it impossible for AEM to make the payment" that was due on September 14, 2023. CC ¶¶ 78-79. As a result, on December 7, 2023, the parties

executed two new agreements. CC ¶ 80. The first was an agreement to terminate the Supply Agreement (the "Termination Agreement"), which allowed AEM to purchase batteries from other sources. *Id*. The second was an amendment to the Promissory Note (the "Amended Note"), which credited $3 million to AEM based on the transaction in the Termination Agreement, and left a remaining balance of $2,662,097.86. *Id*. AEM alleges that it "agreed to these changes with the reasonable belief that the Battery Packs that were in the field required servicing but ultimately could be made functional." CC ¶ 81.

AEM alleges that, about three weeks later, on December 27, 2023, all of the Nivalis battery packs "suffered a catastrophic failure . . . because Nivalis never tested for cold temperature performance." CC ¶ 84. The battery packs became serviceable again after the weather warmed but at that point, due to the damage that had already been done, "all of the Nivalis batteries need[ed] to be replaced." CC ¶ 87. Ronald was able to determine that the battery packs "were built improperly, and an important component" was "undersized." CC ¶ 85. "This issue would have been apparent by any proper manufacturing testing by Nivalis." CC ¶ 90. And by September 2024, "the mounting system for several Battery Packs on trailers started to fail" as well. CC ¶ 93.

On May 24, 2024, at the Advanced Clean Technology Show, "Nivalis showcased a product designed to compete with AEM." CC ¶ 97. The product "differed somewhat from the SolarTechTRU," as it was a battery system that plugs into traditional diesel engine TRUs rather than using solar and battery power, "but clearly borrowed from [the SolarTechTRU technology] heavily." *Id*. AEM alleges that although "the products operate somewhat differently," they "are competing in the same business within the nationwide zero-emissions TRUs market." *Id*. AEM alleges that the new product "could

only exist by Townsend and Nivalis taking AEM's" trade secrets and confidential and proprietary financial information. *Id.* On July 22, 2024, "AEM's distributor sent to AEM a letter purporting to terminate its agreement with AEM and seeking the return of its $2 million deposit." CC ¶ 100. Two days later, around July 24, 2024, "the same distributor delivered to AEM's biggest customer Nivalis' competing product." CC ¶ 101.

On July 26, 2024, Townsend filed this case in the Circuit Court for Baltimore County (Case No. C-03-CV-24-002816), and on August 29, 2024, AEM removed the case to federal court. ECF No. 1 (notice of removal). AEM answered the complaint and asserted nine counterclaims against Townsend and/or Nivalis. ECF No. 13. Townsend and Nivalis have filed a motion to dismiss AEM's counterclaims for failure to state a claim. ECF No. 22. AEM has filed a response, ECF No. 25, and Townsend and Nivalis have filed a reply. ECF No. 27.

## II.    LEGAL STANDARD

On a motion to dismiss counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6), courts apply the same standard of review applicable to a motion to dismiss a complaint. *See, e.g.*, *Bayles v. Marsh Realty & Assocs., LLC*, No. 20-cv-3322-DKC, 2021 WL 1198144, at *2 (D. Md. Mar. 30, 2021); *Sand Canyon Corp. v. Bank of New York Mellon*, No. 19-cv-2815-GLR, 2020 WL 5250288, at *2 (D. Md. Sept. 3, 2020); *First Data Merch. Servs. Corp. v. SecurityMetrics, Inc.*, No. 12-cv-2568-RDB, 2013 WL 6234598, at *3 (D. Md. Nov. 13, 2013). "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a party asserts that, even assuming the truth of the alleged facts, the pleading fails "to state a claim upon which relief can be granted," that party may move to dismiss the pleading. Fed. R. Civ. P. 12(b)(6). "In alleging fraud,"

as AEM does in counterclaims 1, 2 and 3, "a party must state with particularity the circumstances constituting fraud"; "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

To withstand a motion to dismiss, the pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and must contain sufficient factual allegations to state a facially plausible claim for relief, *id*. at 570. "A claim has facial plausibility when the [non-movant] pleads factual content that allows the court to draw the reasonable inference that the [movant] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As noted above, when considering such a motion, the Court "must accept as true all of the factual allegations contained in the [pleading] and draw all reasonable inferences in favor of the [non-movant]." *King*, 825 F.3d at 212.

## III.  DISCUSSION

AEM asserts nine counterclaims against Townsend and/or Nivalis: (1) intentional misrepresentation; (2) intentional concealment; (3) negligent misrepresentation; (4) trade secret misappropriation; (5) violation of Section 2 of the Sherman Act; (6) negligence; (7)-(8) breach of contract; and (9) constructive fraud. ECF No. 13. Townsend and Nivalis argue that none states a claim on which relief can be granted. For the reasons explained below, the Court agrees with Townsend and Nivalis with respect to Count 6 and will dismiss that counterclaim. The Court otherwise finds that AEM has stated cognizable counterclaims.

### A.  Counts 1-3: Intentional Misrepresentation, Intentional Concealment, and Negligent Misrepresentation

In Counts 1 through 3, AEM asserts counterclaims for misrepresentations

allegedly made by Townsend and Nivalis for "falsely and knowingly misrepresent[ing] to AEM . . . that the Battery Packs that he sold to AEM would be highly efficient and last for 8-12 years—approximately twice the capacity of the batteries that Townsend previously sold to AEM through a former business." ECF No. 25 at 10–11.[3] Townsend and Nivalis argue that AEM fails to adequately allege that AEM relied on Townsend's statements, particularly because the Supply Agreement contained an express integration clause. ECF No. 22 at 19–20. They also argue that AEM is alleging a breach-of-contract claim disguised as a tort claim. *Id.* at 20.

AEM does not need to *prove* that it relied on Townsend's statements about the power of the battery packs; it need only *allege* that it plausibly relied on Townsend's statements, which it does throughout the counterclaims. *See, e.g.*, CC ¶¶ 109, 122, 134. And "Maryland law clearly states that a plaintiff can successfully bring a tort action for fraudulent or negligent misrepresentation based on false promises even if the written contract contains general merger language and the alleged false promises are not mentioned in the written contract." *Carroll Co. v. Sherwin-Williams Co.*, 848 F. Supp. 2d 557, 568 (D. Md. 2012) (citing *Greenfield v. Heckenbach*, 144 Md. App. 108 (2002)). Although the presence of merger language may ultimately bear on whether Townsend or Nivalis intentionally or negligently misrepresented or concealed certain facts, and/or whether AEM reasonably relied on the alleged statements, "at this early stage of litigation the Court cannot decide as a matter of law that the merger language defeats the reasonableness of Plaintiffs' reliance on extra-contractual representations." *Id.*

---

[3] Page number references correspond to ECF pagination, which may differ from the pagination used by the parties.

Accordingly, Counts 1, 2 and 3 state claims (with particularity) upon which relief can be granted.

###### B.    Count 4: Trade Secret Misappropriation

In Count 4, AEM sues Townsend and Nivalis for trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"). CC at 49–54. To prevail on such a claim, a plaintiff must establish "(1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." *dmarcian, Inc. v. dMarcian Europe BV*, 60 F.4th 119, 141 (4th Cir. 2023) (citing *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021)). Townsend and Nivalis argue that the claim should be dismissed for three reasons.

First, Townsend and Nivalis that AEM has not identified any trade secrets that could give rise to a DTSA claim. ECF No. 22 at 23–24. A trade secret is defined as "information that is subject to 'reasonable measures to keep such information secret' and which 'derives independent economic value' from its secrecy." *Sysco Machinery Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025) (quoting 18 U.S.C. § 1893(3)). AEM has plausibly alleged the existence of "financial business, scientific, technical and engineering information," client lists, and vendor lists that are all conceivably protected by trade secret law. *See* CC ¶¶ 140-145; *see also Brightview Group, LP v. Teeters*, 441 F. Supp. 3d 115, 130 (D. Md. 2020) (finding a likelihood of success that underwritings, customer lists, pricing sheets, business strategies that had been misappropriated in that case constituted trade secrets).

Second, Townsend and Nivalis argue that the information that AEM describes as trade secrets was not "secret" because AEM holds a number of patents on the SolarTechTRU technology, and patents require public disclosure of at least some

information about the patented technology. ECF No. 22 at 24. But even if some information about SolarTechTRU is publicly available, AEM has plausibly alleged that AEM's customer lists, pricing information, research going into the development of SolarTechTRU, and other information are *not* readily ascertainable to the public. *See, e.g.*, CC ¶¶ 140, 146, 148, 149; *see also MicroStrategy Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004) (holding that "because information is disclosed outside of a company does not result in the loss of trade secret status" and that "customer lists, pricing information, marketing and sales techniques, information about products," etc. all constitute trade secrets).

Third, Townsend and Nivalis argue that AEM has not adequately alleged that any trade secrets were misappropriated. ECF No. 22 at 24–25. Their argument is that because AEM defaulted under the Promissory Note, and the accompanying asset pledge that was signed by all parties provides Townsend with a security interest in "all property and assets of" AEM, that means Townsend and Nivalis have been in lawful possession of any such trade secrets. *Id.* at 24. But that argument does not present grounds for dismissal on the pleadings because (1) AEM has sufficiently alleged that Townsend and Nivalis misappropriated AEM's trade secrets before AEM defaulted on the Promissory Note, *see, e.g.*, CC ¶¶ 48, 56, 77, and (2) the Court has not yet reached the question of whether AEM defaulted or breached the terms of the Promissory Note.

For these reasons, AEM has sufficiently pled a trade secret misappropriation claim.

### C.    Count 5: Attempted Monopolization

In Count 5, AEM sues Townsend and Nivalis for attempted monopolization under Section 2 of the Sherman Act, ECF No. 13 at 49–54, which makes it unlawful to

"monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

"To prove a Section 2 monopolization offense, a plaintiff must establish two elements: (1) the possession of monopoly power; and (2) willful acquisition or maintenance of that power—as opposed to simply superior products or historic accidents." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 480 (1992), and *Cavalier Tel., LLC v. Verizon Va., Inc.,* 330 F.3d 176, 183 (4th Cir. 2003)). An *attempted* monopolization claim requires that a plaintiff allege facts establishing "(1) the use of anticompetitive conduct; (2) with specific intent to monopolize; and (3) a dangerous probability of success." *Id.* (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993), and *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990)). "Monopolize" means to use "the power to control and dominate interstate trade and commerce . . . to such an extent that they are able . . . to exclude actual or potential competitors from the field [ ] with the intention and purpose to exercise such power." *American Tobacco*, 328 U.S. at 784–85; *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973) ("Use of monopoly power 'to destroy threatened competition' is a violation of the 'attempt to monopolize' clause of § 2 of the Sherman Act"). A threshold determination for a Section 2 monopolization or attempted monopolization claim is to define the relevant "market," but "market definition is a deeply fact-intensive inquiry" and so "courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *E.I. Du Pont*, 637 F.3d at 443.

"Specific intent" to monopolize "may be inferred from the defendant's anticompetitive practices." *M & M Medical Supplies and Service, Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 166 (4th Cir. 1992). In determining whether a company is employing anticompetitive conduct, the Supreme Court notes that "[i]f a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (citation omitted). As to the dangerous probability of success element, market share is "relevant" but "compelling evidence of an intent to monopolize or of anticompetitive conduct reduces the level of market share that need be shown." *M & M Medical*, 981 F.2d at 168. "Other factors must be considered . . . [like] exclusionary conduct without the justification of efficiency, which enhances the likelihood of success." *Id.* An "allegation of a dominant market share coupled with exclusionary conduct" is generally enough to withstand a motion to dismiss for failure to state a claim. *Id.* (citing *Advanced Health-Care Services, Inc. v. Radford Community Hospital*, 910 F.2d 139, 147–49 (4th Cir. 1990)).

Townsend and Nivalis argue that AEM has failed to state a claim as to all three elements of AEM's attempted monopolization claim. ECF No. 22 at 25–28. The Court disagrees. AEM alleges that Townsend and Nivalis engaged in anticompetitive, predatory conduct and had specific intent to monopolize the market because AEM alleges that they (1) sold defective battery packs to AEM; (2) misappropriated AEM's trade secrets; (3) sought to leverage the defective batteries to collect on the Promissory Note; (4) developed a competing product using the misappropriated trade secrets; (5) interfered with AEM's relationship with a distributor; and (6) subsequently delivered its competing product to the distributor. CC ¶ 165. As to probability of success, AEM

defines the relevant market to be the nationwide market for zero-emission TRUs for the purpose of food delivery. *Id.* ¶¶ 162-64. And AEM alleges that, if it is displaced from this market, "customers who seek a zero-emissions TRUs [sic] will have no choice but to use the Nivalis product." *Id.* ¶ 167. AEM has also alleged that it is currently "the only successful business in that marketplace." *Id.* ¶ 29. Finally, AEM has alleged that Nivalis is already displacing AEM's relationships with customers and distributors. *Id.* ¶ 169.

Courts have held that allegations of this kind of conduct rises to the level of attempted monopolization that Section 2 requires at the motion to dismiss stage. *See, e.g.*, *Advanced Health-Care*, 910 F.2d at 148 (holding that a defendant with a large market share who is anticompetitively excluding a competitor and thereafter providing an inferior product to consumers may be liable for attempted monopolization under Section 2); *E.I. du Pont*, 637 F.3d at 441–42 (holding that allegations of a distinct relevant geographic and product market, coupled with allegations of market share, are sufficient to plead an attempted monopolization claim). Therefore, at this stage, AEM has sufficiently pled a Section 2 attempted monopolization claim.

### D. Count 6: Negligence

In Count 6, AEM sues Nivalis for negligence because the battery packs it delivered "failed to comply with the specifications set forth in the Supply Agreement and in the Termination Agreement." CC ¶ 175. Nivalis argues that this claim should be dismissed because it is a contract claim cloaked as a tort claim. ECF No. 22 at 28. Nivalis is correct that the negligence claim AEM asserts is merely a restatement of the breach of contract claim for failing to satisfy the terms of the Supply Agreement. *Mesmer v. Maryland Auto. Ins. Fund*, 353 Md. 241, 252–54 (1999) (holding that liability arising out of a contractual obligation does not give rise to a negligence claim) (collecting cases

holding the same); *Board v. Plymouth Rubber*, 82 Md. App. 9, 31, *cert denied*, 320 Md. 505 (1990) ("Under Maryland law, negligent breach of contract, absent a duty or obligation imposed by a source independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort"). Here, the only duty of care alleged that Nivalis owed AEM is one "to manufacture and deliver compliant Battery Packs that would operate in a reasonable and non-defective manner," which AEM concedes are specifications set forth in the Supply Agreement and in the Termination Agreement. CC ¶¶ 175, 178. Therefore, Count 6 will be dismissed.

### E.    Count 7: Breach of Contract (Supply Agreement)

In Count 7, AEM alleges that Nivalis breached the Supply Agreement by delivering defective battery packs, and by misappropriating AEM's confidential information. CC ¶¶ 181–89. Nivalis argues that Count 7 should be dismissed because on December 7, 2023, in the Termination Agreement, the parties agreed, "as of the Effective Date, to terminate the operation and effect of the [Supply] Agreement, such that the parties shall have no further liability, responsibilities, or obligations in connection therewith, except as expressly set forth herein." ECF No. 22 at 29–30. AEM argues that the Supply Agreement has an unambiguous survival clause with respect to several provisions that do not have corollary provisions in the Termination Agreement. ECF No. 25 at 28. AEM also argues that the Termination Agreement's release provision (if it even constitutes a release) is ambiguous. *Id*. at 29–30.

The Court agrees that the release provision contained in the Termination Agreement is ambiguous with respect to whether, as Nivalis asserts, "no further liability" extinguishes any claims accrued prior to the Termination Agreement, or as AEM contends, only is forward looking. ECF No. 25 at 29. Where a contract provision is

subject to multiple interpretations, it is "ambiguous." *Calomiris v. Woods*, 353 Md. 425, 436 (1999) ("a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning"). And the construction of an ambiguous contract provision "is a factual determination that precludes dismissal on a motion for failure to state a claim." *Martin Marietta Corp. v. Int'l Telecomm'ns Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992) (citing *Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir. 1972)). In reaching this conclusion, the Court need not and does not decide at this time whether the release does or does not extinguish AEM's claims asserted in Count 7, or whether the release is precluded by the survival clause in the Supply Agreement.

### F.    Count 8: Breach of Contract (NDA)

In Count 8, AEM alleges that Nivalis breached the NDA by misappropriating AEM's confidential information. CC ¶¶ 190–97. Nivalis argues that Count 8 should be dismissed because (1) Nivalis acquired AEM's confidential information legally upon AEM's default, (2) AEM fails to allege the identity of any confidential information, and (3) AEM fails to allege that Nivalis learned of any of AEM's confidential information while the NDA was operative. ECF No. 22 at 30–31. Nivalis's first and second arguments fail for reasons already explained above with respect to Count 4, *see supra* III.B. As to the remaining arguments for dismissal, AEM has alleged, and the Court must take to be true at this stage of the pleadings, that the NDA was operative for three years after the June 15, 2022 effective date, CC ¶ 192, and that AEM received sensitive confidential information. *Id.* ¶ 193 (incorporating the information laid out in Count 4).

### G.    Count 9: Constructive Fraud

Lastly, in Count 9, AEM asserts a claim of constructive fraud against Townsend and Nivalis because Townsend "undertook a confidential relationship with AEM" to

receive sensitive confidential information in furtherance of his due diligence efforts, and he later "us[ed] that information and his position to injure AEM." ECF No. 13 at 64–67. Townsend and Nivalis argue that Count 9 should be dismissed for failure to state a claim. ECF No. 22 at 32–34.

A party commits constructive fraud when it "breach[es] a legal or equitable duty" to another that "tend[s] to deceive others, to violate public or private confidence, or to injure public interests." *Canaj, Inc. v. Baker & Div. Phase III, LLC*, 391 Md. 374, 421–22 (2006) (quoting *Md. Envtl. Trust v. Gaynor*, 370 Md. 89, 97 (2002)) (emphasis and internal quotation marks omitted). "[A] defendant owes an equitable duty to a plaintiff where the parties are in a confidential relationship." *Thompson v. UBS Financial Services, Inc.*, 443 Md. 47, 69 (2015). A confidential relationship exists where one party "has gained the [other party's] confidence . . . and purports to act or advise with the [other party's] interest in mind." *Id.* (quoting *Buxton v. Buxton*, 363 Md. 634, 654 (2001)). "[A]ll fiduciary relationships are confidential relationships." *Id.* at 70.

Here, Townsend and Nivalis clearly have a confidential relationship with AEM, at least through the terms of the NDA. CC ¶ 203; *see Ingram v. Cantwell-Cleary Co., Inc.*, 260 Md. App. 122, 167 (2023) (holding that having employees sign non-disclosure agreements was a reasonable step to ensure confidentiality of information); *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 310–11 (2004) (same). And because AEM has alleged the existence of a confidential relationship, and for the reasons explained above with respect to AEM's counterclaims of intentional and negligent misrepresentation, *see supra* III.A, AEM has stated a claim for constructive fraud.

## IV.    CONCLUSION

For the reasons discussed above, Count 6 of AEM's counterclaims will be dismissed without prejudice. The motion to dismiss will be denied with respect to all remaining counts. A separate order follows.


Date:  August 29, 2025                                 _____/s/_____

                                                        Adam B. Abelson
                                                        United States District Judge